How much time would you like to reserve for rebuttal? Five minutes, Your Honor. All right. Go ahead, please. May it please the Court, good morning. Lee Rubin for Mayor Brown on behalf of the appellant Donald Olgado, who is present in the courtroom today. In order to lawfully convict Donald Olgado of 11 counts of unlawful possession of trade secrets, the government had to prove beyond a reasonable doubt the following essential elements, among others, that he knowingly possessed trade secret information, that he knew that the information was the product of an act of trade secret theft. That is, that the trade secret information had been stolen, obtained, or appropriated without authorization, and that he intended to convert that trade secret information for the benefit of someone other than his employer, applied materials. But the government, Your Honors, failed to prove each of those elements. The government's theories advanced at trial and now on appeal disregard the text of the statute and the decisional law that's available regarding those statutory terms. If the government's theory of prosecution here were accepted by this Court, it would substantially expand the scope of criminal liability even well beyond the scope of federal. I'm sorry, one second. Could we slightly reduce the volume? I don't know if IT can do that, please. Or I could move it back a little bit. Okay, thank you. Sure. Even well beyond—is that better? Yes, thank you. Even well beyond the scope of federal civil liability for trade secret misappropriation. Now, the following facts we believe are— I apologize for this sound issue, but it's reverberating up here. Yeah, understood. Okay. Go ahead, please. The following facts we believe are undisputed on the record, that Mr. Elgato had company permission to access the 11 sets of files he downloaded that is the subject of the indictment in the prosecution, that he did not disclose those—the information contained in those files. Okay, but he didn't have permission to access those for a startup company, did he? He— He had authority to access it for purposes of advancing applied interest, not for the interest of Envision, the new startup company. You would concede that, right? What I would — I agree, Your Honor, that he didn't — nobody expressly gave permission to access the information for Envision, but there's no— In fact, he was prohibited, was he not, to engage in outside business activities. He was prohibited from using applied material for his personal purposes. I'm looking at the standard of business conduct here. You may not engage in outside business activities that compete or appear to compete with the interest of applied materials. Ed, Your Honor, the standard of business conduct, you say that, that applied materials, witnesses testified that's company guidance. That was not part of any employment agreement that Mr. Elgato ever saw. Well, Mr. Elgato engaged in extensive efforts to conceal his activities. So he knew that what he was doing was not authorized. I mean, let me just go through the evidence, right? He said he's concerned about a paper trail to his co-conspirators starting Envision, the competing startup. He said we have a conflict of interest with applied materials. He lied about the need for his exemption from their policy against copying data to personal USB drives. He made up a lie as to why he needed an exemption from data loss prevention software. He said, oh, I need to outsource the design activities to consultants and suppliers. All of that activity, to me, indicates consciousness of guilt. Mr. Elgato knew what he was doing, and he made every effort to conceal his tracks. But, Your Honor, the statute requires an act of trade secret theft. And even the government concedes that the best place to turn for the text to determine what an act of trade secret theft is is the civil analog under 1836 and the definitional terms under 1839, which gives you two different prongs to prove misappropriation. One, that you used improper means, or two, that you disclosed or used it. There's no evidence in this record that he disclosed these trade secrets to anybody, that he forwarded them to himself, and he never disclosed them to anybody outside Applied, and there's no ---- He had every intention to use it for Envision. If it took Applied, based on their materials, it took them four to six years to create this product, right? That Applied said, we want to close this business line down. Envision said, we will get this product up and running 12 to 15 months. How does a little startup of four former Applied engineers do that in that much time, unless they're going to use the 98 percent of the files that Mr. Olgado took from his employer? They were going to piggyback off that to jumpstart that amount of time to have a competing product online so quickly. Your Honor, we're not disputing that there was evidence in the record of some intent to later use the information that was downloaded, although we are disputing that he had any intent to use the 2D drawings, because there was never any evidence of that. There was never any evidence of that. He said he got the software, but because they weren't going to get the funding until January of the next year, he wanted to wait and not pay for that particular software license until the investor funding came in. If I may, Your Honor, the fundamental question here is, can consciousness of guilt intent establish the essential element of an act of trade secret theft? We say, absent some binding policy that specifically prohibits him from doing what he did, there just was no act of theft. You either have to prove, under civil liability as well, Your Honor, and we're talking about a criminal prosecution, but even under civil trade secret. This looks like textbook criminal trade secret theft to me. Well, Your Honor, we just need to look at the statute. Let's look at the statute. Anyone who possesses such information knowing the same to have been appropriated or obtained without authorization. Right, and so as we advance, and the government doesn't dispute, in order to determine, and the district court as well, look to the definition of what does misappropriation mean under Section 1839? Because that's the best place to look to determine whether somebody obtained or appropriated information without authorization. And what does that definition say? It says you either have to obtain it by improper means, improper means, and that means taking something by misrepresentation, espionage, or a duty or breach of duty of secrecy, or using or disclosing. I think we can all agree there is no use or disclosure here. But you're saying circumventing all of applied data loss prevention software is not improper means. That's your position. Our position is that the software, first of all, Your Honor, let me be clear on the record, the government actually offered evidence that he downloaded about 2,000 files in early September. Well, let me just get an answer to my question. Do you think that I'm an employee at Applied, I know that my employer is implementing data loss prevention software that does not allow me to download these files for my personal purposes or for outside business activity, and I say I need to hire some hackers, but then I find out a way to get around this by somehow deceiving the software into thinking that my computer is an authorized computer to receive these. My personal storage devices are authorized users to receive these files. And then I say, oh, their data protection software is pathetic. Let me know, the rest of my, you know, envisioned, you know, partners, whether you need me to download anything else from the files of Applied. You're saying that does not show improper means. Correct. Every district court decision, every single district court decision that has weighed in on this subject, when individuals transfer confidential information to themselves in many cases, Your Honor, like the CPI case, CPI card case, like the Angel of Mortgage case, they transfer them days before, the day before they're resigning. I believe, Your Honor, would have the same righteous indignation in those cases. And in each of those cases, the court found, the district courts found, without any evidence that they were specifically violating a signed binding agreement that expressly prohibited what the employee did, it's not improper means. But in none of those cases did the employer have a data protection software that prevented those employers from sending that information to themselves, correct? None of them did the circumvention that Mr. Elgato did, correct? None of those cases. They just sent them to themselves. Right. But none of them were circumventing a specific data loss prevention software that the employer had instituted. So Mr. Elgato is different, right, than all those cases? There's no question they don't have those facts. They do have facts that they actually, unlike here, that they had signed confidentiality agreements that specifically prohibited using the information for a noncompany purpose. Unlike here, where there was no signed agreement, there were signed agreements in those cases. So why did he go through so much efforts to conceal?  Why didn't we tell him to apply? Hey, you all don't want to continue this product line. I do. I'm going to take 98 percent of the files that you have spent four to six years, $100 million creating, and I'm going to use them at a vision. Thank you. Why not be open and notorious? If it is legal, if it is permitted, be open and notorious. Why conceal? Your Honor, there's a gap between any consciousness of guilt, concern about what telling the company what you're doing for purposes of compliance with what you believe the company would be unhappy about or concerned about versus actually committing an act of trade secret theft. That's what these cases are about. They're trying to create some bounds, because if we just, in each and every criminal trade secret case, said he was up to no good, if that's the standard, then I don't believe that that's a constitutional standard for a criminal statute. Okay. So let me get one last concession. I will stop asking questions. Do you concede that Mr. Elgato violated applied standard of business conduct and trade secret policy? You concede that, but you just say he wasn't bound to comply with those. That's what I understand your argument. And that is what the case is. Okay. But you agree he did violate them. But he was allowed to. He was permitted. He was permitted to violate them. He was downloading them for a noncompany purpose, and that happens with some regularity, I think, with employers all the time. My question is, do you concede that he violated the standard of business conduct and the trade secret policy of his employer? I don't believe you can use the word violated when it's not a binding agreement. No, and I think that's what the cases talk about, because you can't give rise to a duty of secrecy. Did he act in contrary? Did he act inconsistently with those, the standard of business conduct and the trade secret policy? He was acting inconsistently with the policy. With a nonbinding agreement. With a nonbinding policy that he only acts strictly in accordance with company purposes. Yes, that was inconsistent. I'm sorry. Can you repeat that one more time, please? The policy basically said, don't do anything with applied confidential information that is not strictly in accordance or advancing the company's interest, essentially. And I am acknowledging that when he was downloading those materials, the jury was offered evidence that he was acting for a noncompany purpose. What we are saying is, quite emphatically, is that that can't constitute an act of trade secret theft by itself. There has to be an anchor. There has to be an act of trade secret theft that either falls within improper means or use or disclosure. We don't have use or disclosure here, so we have to find improper means. The case law is quite clear that simply because you have a confidentiality agreement, signed even, that says, don't use these for noncompany purposes, courts do not rely on that, even signed agreements, when somebody forwards information to themselves. They do not rely on that. They say that is not sufficient. That's what Angel Oak says. That's what CP. Every district court, as a matter of fact, Your Honor, every district court that has taken on the question has said that. And so we believe at a minimum, Your Honor, because we have the government hasn't pointed to any case that actually supports their theory at all. And so at a minimum, Your Honor, we have a rule of lenity issue. If there is ambiguity in the statute, what does it mean to violate the to breach a duty of secrecy here? What does it mean to obtain without authorization when there is no specific prohibition that you entered into a contract on? That should not be the subject of a pioneering or groundbreaking prosecution. That should be the subject maybe of civil liability, where somebody sues somebody in civil court and asks for damages, but not a criminal case, where issues of due process and notice are at issue. Let me, Your Honor, if I may turn to the possession, the question of possession. In this case, there were two kinds of alleged trade secret information in these files. There were drawings that were the actual blueprints for the MOCBD tool, and there were 3D models. Excuse me. The district court said there was no expert testimony offered to establish that the 3D model portion of the information was alleged to be trade secrets, that there was no information at all offered that those were — had independent value from their secrecy. And in fact, the district court came very close to finding that they weren't, because when, in footnote 2 of the district court's order, the district court basically says, well, there still could be an intent to harm because this information was useful, even though there's no evidence that it was actually a trade secret. So the 3D models, the government did not establish that they were trade secret information. So what are you left with? You're left with the question of whether Mr. Elgato possessed trade secret information with respect to the 2D drawings. Those are the two-dimensional blueprint drawings. Your Honor, there is no evidence in this record to establish beyond a reasonable doubt that he possessed those drawings, because he didn't — had never acquired the software that would allow him to read those. And, Your Honor, need look no further than the Flyer case. The Flyer case is about illicit child pornography images. And in that case, the court said there are two elements when electronic information is involved. One is — But Mr. Flyer was unaware that those files were even on his computer. They were in some unallocated portion of his computer. He wasn't the one who actively downloaded them himself, correct? That is a distinction between Mr. Elgato's situation and Flyer. Well, there was no question in Flyer that he owned and controlled that computer. Right, but — It is absolutely true that the court found two elements wanting, lacking. One was the knowledge, and two was access. And they pointed to both. I'm sorry. I'm going to read from Flyer. The government concedes that it presented no evidence that Flyer knew of the presence of the files on the unallocated space of his Gateway computer's hard drive. The government also concedes it presented no evidence that Flyer had the forensic software required to see or access the files. So the government presented no evidence that Mr. Flyer knew of the presence of the files on his hard drive. That seems like it's distinguishable from this case. Well, it's — it's distinguishable in the lack of knowledge, no question. There's no — there's no dispute here that Mr. Elgato had knowledge of the files that — of the files that he — that he had downloaded. But the point of Flyer, the point of Kuczynski, the point of Rahm, all three cases that Flyer — all the other cases that Flyer built upon, is there are two essential elements in that context for whether you possess electronic information. One is knowledge that the files are there, and two is access to the files. And — and, Your Honor, none of those courts, there would have been absolutely no reason for the court to address the question of access if knowledge was the only element, because — Okay. I'm looking at Kuczynski as well. It says the record shows Kuczynski had no knowledge of the images that were simply in the cache files. Right. And the — So, I mean, that is one distinction to draw from these child porn cases, that there was no evidence. Right. And at the end of that — and at the end of that opinion, the court says — I just happen to have it quoted here — the court found no possession where the defendant lacked knowledge and, quote, concomitantly lacked access and control over those files. Counsel, Judge Gould, if I could interject my question, please. When you started, you said you wanted to hold five minutes for rebuttal. You're down to about two minutes. Okay. Your Honor, I wasn't sure when this was put. Thank you. I'll reserve the rest. Well, I think you should answer fully the question that Judge Koh is asking you. But if you want to make rebuttal, you're going to have to stop before all your time is gone. Thank you, Your Honor. I had thought that the time had been put to 15, so I apologize. But, Your Honor, I'm happy to answer the question. I don't want to — You've answered it. Thank you. Okay. Okay. And I'm going to — it says 1.36, but I think it was 2.03 when you started. So you'll have 2.03 in rebuttal. Thank you. Good morning, Your Honors. May it please the Court, my name is Mary Jean Chan, and I represent the United States in this appeal. This is a textbook case of trade secret theft. Mr. Elgato downloaded 98 percent of the engineering plans for Applied Materials' proprietary MOCVD reactor. But isn't it true a lot of employees download the files to work at home? Are you criminalizing behavior that's routine among engineers at a lot of tech companies? Absolutely not, Your Honor. 1832 has multiple elements, including the intent to convert, as well as the possession of such information, knowing the same to have been stolen or appropriated, obtained or converted without authorization. But Mr. Elgato had access to the files through the team center. Doesn't that undermine the jury's verdict on the without authorization? No, Your Honor. 1832 is different than 1030, which is the Computer Fraud and Abuse Act. And that statute, the 1030 statute, is one that criminalizes inappropriate access. And that's in the text of the statute. 1832 targets something entirely different, which is broader and beyond access. And that is the theft or the inappropriate appropriation of trade secret information. And so those are two very different statutes. And here he might have had access, but there were specific user and access restrictions upon him. The standard of business conduct, for example, made it very clear, and Mr. Elgato had worked out there for 20 years and was actually charged with enforcing these. So how do you respond to the arguments that were made by your friend on the other side, that there are a whole line of cases that talk about even when employees sign confidentiality agreements, that does not amount to improper means if there are files that are taken that are otherwise available? And where is that line between sort of what constitutes maybe civil liability for a misappropriation that does, I think, in fact, happen a lot in the, you know, commercial industry and on the civil side versus what amounts to a criminal liability? Right. I have two responses. First of all, Your Honor, 1832 has plain text that governs here. And 1839's definition of misappropriation can inform how we understand 1832, but it is a narrower definition. And misappropriation is defined in 1839 with respect to the civil remedy, which is 1836. That does not require an intent to convert. And specifically Congress, in imposing this and creating the definition of misappropriation, did not use the same language without, that's in 1832, which prohibits the appropriation without authorization. So those are two different terms. One is misappropriation. One is appropriating without authorization, without explicit permission. So those are two separate things. Civil remedy has a narrower sort of definition in terms of the conduct, but there is no requirement. There's also no requirement of intent to convert or the criminal intent that's at issue in 1832. I also want to address the cases that Mr. Elgato's defense team has sort of raised, and none of them support his argument that there has to be a violation of a specific contract in order to constitute acting without authorization. So, for example, Nagel, the case, first case that he addresses, is actually one that talks about breach of contract. It's a breach of contract claim as opposed to a trade secret theft, the language that he cites in his reply brief. The CPI card group case that my friend just referenced in his argument simply said that it is an uphill battle, not that it's impossible, to demonstrate misappropriation of questionable trade secrets where, quote, Dwyer's confidentiality agreement did not per se prohibit him from forwarding emails to his personal email account. It doesn't say that appropriation, misappropriation even, under the 1839 language, which is not the language at issue here, the language here is without appropriation, sorry, without authorization, that it's not even in that context impossible to demonstrate misappropriation. Angel Oak Mortgage Solutions also didn't require a contract or a violation of the contract. It was simply the plaintiff's theory in that case that the way the information had been acquired through improper means, the theory was that it was because it was a violation of the contractual, sorry, provisions. And the court's decision simply looked at those contractual agreement and said that that didn't match up as something that was violated by the defendant's actions. So none of the cases that my friend cites actually support his theory that there has to be a violation of a specific contract that's a signed agreement. In fact, those cases don't even talk about a signed agreement. They simply presume it's contract. There is no basis for importing contract theory into 1832, which simply talks about without authorization, which is, is your employer giving you permission? We're not talking about general information. We're talking about a very specific class of information, which is trade secret information, that Congress took particular care in the Economic Espionage Act to protect. And it did so in language that is supposed to be quite comprehensive. It talks about information that's stolen. It's information that's appropriated, converted, obtained without authorization. That's really to cover anything so that there's no cracks left in terms of the kind of language that might be to the extent that there's a delta between theft and conversion and misappropriation. This does not criminalize conduct, as I said. That would not give rise to trade secret theft under civil laws because primarily we have an intent to convert here. We're talking about a criminal statute. We're not talking about civil misappropriation. So let's assume that I agree with you that there doesn't need to be a signed agreement that necessarily exists to be able to show the without authorization. What is the floor? I guess what I'm asking, you know, really goes to this point of how does this not, how does this criminal statute not get used in ways that bring into the fold all the kinds of misappropriation that's occurring in the civil context? So what is the floor for what a without authorization looks like? So if you have a company policy and there were, you know, steps taken, like there were here in this case by Applied to restrict its information, is that enough? The mere sort of downloading of files when there is a company policy, generally speaking, to prevent that taking of information, is that enough to be able to show misappropriation without authorization? It's not enough by itself to constitute a violation of 1832A3, which requires there, as I said before, the intent to convert a trade secret to the economic benefit of anyone other than the owner thereof. And so somebody who, for example, maybe violates a use restriction or an access restriction to take it home to, you know, tell a work, they're really not supposed to take this trade secret information because the reasonable measures that the company has taken include keeping the information at the workplace. But they take it, but they're doing the work for their employer. They're really trying to do everything that they can to sort of just do their job. They're not taking it and converting it. They're not acting with an intent to convert it to the economic benefit of anyone other than their employer, which is the owner of the trade secret. They also have to act in a way where they know that this is going to be injuring or they believe that this will be injuring the owner. And that's not something that would be in that case as well. So there are protective elements in 1832 that would protect the innocent person who is there working and just doing their job and maybe not as careful as they should be. But that's not this case, Your Honor. This case is a situation where Mr. Elgato was violating not only sort of these use and access restrictions that kept him from, you know, accessing the team center database without a need to know. And he did this months after that division, the LED division, had wound down and was shutting down, months after the company had specifically rejected the idea that they could license this for some startup. And he did this in a way that circumvented specifically software blocks that prohibited him from downloading from team center to external storage device. And that's a very key element here that really distinguishes him from any other innocent owner. And we have a trail of emails that, in his own words, shows that he did this with the intent to convert. He's trying to start up a company. He's trying to jumpstart that company by taking sort of just, you know, shortcuts because it would take a lot of time otherwise to develop this. In his own words, he did all this, gathered all this 98% of information. He acquired licenses for software that would allow him to work with both the 3D and 2D drawings in order to create a stable base to start designing. But let's get to that point. He didn't actually have the NX software. And Mr. Rubin is correct, you know, in FLYER, the court found that it was pretty important that Mr. FLYER didn't have the forensic software to access the files. So, you know, what about Mr. Elgato's argument that you're making the possession standard too low? You're saying any time there's a file on your computer, as long as it is humanly possible that you might acquire a license in the future to a software that would allow you to access it, then you're going to be criminally liable. That's not the government's argument here, Your Honor. In FLYER, specifically, there was no evidence that he had the forensic software required to see or access it. Here, actually, it is not that case. What we have is Mr. Elgato procuring, negotiating specifically for the license. He just simply didn't activate it yet. He was waiting to be able to maximize the value of that until he had basically used up the Solid Edge software to the maximum ability before integrating or triggering the NX software. So he had it. To use the kind of key analogy that I think the government has advocated and that is supported by the Medrano case, he had the key to the lock. He had the key to the storage facility. He just put it on the mantle because he wanted to wait a little bit before he actually used it. So this is not a situation where it's even a situation where there's some software somewhere out there that he might know generally that's publicly aware. The evidence here showed that he specifically knew that he needed the NX software. He negotiated for this license as part of a package deal along with the Solid Edge software, and he specifically intended to use that to access the 2D drawings but was waiting until he had maximized because they were operating in a situation where they were not only trying to achieve a very ambitious timeline for the Envision company, but they had not had procured investment yet. So they were operating on low capital. And so he was being very, I guess, prudent in the way he spent his resources. But you would concede he didn't actually have the NX software. He had the option to use a free three-month NX software, but he didn't actually have it at the time. I guess I would disagree, Your Honor. He had the license. He just had to activate it. To me, that's having it. It's just whether you start it. So if you could have a car and until you start it, you haven't used it yet, but that's just not activating it. I think he had it, and he certainly seemed to know about it. That's very different than the Flyer and these other cases where the defendant not only did not know of the presence. Here we have a situation where he not only knew of the presence, he put it there. He was the one who downloaded it and put it there specifically to use. And in Flyer and Rahm and Kuczynski, you have a situation where there is no sort of knowledge or access to the forensic software. Here, there is knowledge of the software. He had procured the software and simply hadn't started to use it yet. And that's just a matter of timing. So that cannot be, and that should not be, and that is not the Ninth Circuit's limitation on possession. The jury instruction given here is absolutely in accord with the Supreme Court's decision in Allen as well as Rahm in this case with respect to electronic child pornography. Now, you're arguing that the 3-D versions are also trade secrets, but didn't Judge Freeman's original order say that you presented no evidence that the 3-D drawings were in fact trade secrets? No, Your Honor. I believe that Judge Freeman's order said that the government had argued and presented that they were a package, that the files were what were at issue, the trade secret, and they combined both 2-D and 3-D drawings. So the government wasn't arguing that it was only the 2-D or only the 3-D. Independently, it was a package deal. Yeah, I understand the package, but still I thought that, and you can correct me if I'm wrong, that, oh, I'm looking at her original decision. It says government did not elicit testimony from the government's expert, Dr. Goetz, that the 3-D part of the CAD drawing derived independent economic value from being secret. Now, the testimony did say that combined 2-D, 3-D did, but you didn't have, at least from what I can see from Judge Freeman's ruling, any expert testimony on one of the key elements to establish that the 3-D drawings were trade secret. So how can you now come in and argue, but, oh, the 3-D drawings were trade secret, so it really doesn't matter whether he had access to the 2-D part. Well, I think that was the order that she actually then, that was her original order. She then reversed it because that was limited just to Dr. Goetz's testimony, and she agreed later on that there was other testimony that was also relevant to whether something was a trade secret. It wasn't simply limited to the expert testimony. And so if you look at the evidence that was admitted at trial, it was sufficient to show that the 3-D drawings were very specifically also trade secrets. There was a lot of testimony by some of the engineers that the 3-D was what engineers started with, and it was only by flattening that that they really got to the 2-D, that there was independent value to the 3-D drawings because the 3-D drawings could be cut, cross-sectioned, manipulated to understand how the parts worked, apart from something that was just sort of the solid by itself. But wasn't there also testimony that when you sell this part to customers, what they get is even more valuable than the 3-D drawings? There was testimony that the jury was entitled to reject. And so under the sufficiency standard here, the court should be looking at the evidence in the light most favorable to the government and to the prosecution in upholding the 12-person jury verdict. And so that testimony, I think I would submit that to the extent that it was contradicting the other testimony that suggested that this was something that was separate and valuable than just the independent parts because you could not only look in cross-section parts, but you could also manipulate them and use them to design from, that it was different than the parts themselves. And the trade secret here, I mean, there's a reason why, for example, Mr. Elgato did not just print out PDFs of these parts. He wanted them in a specific format so that he could, as he said, have a stable base to start designing from. This was something that would allow him to start designing from right away because these are the engineering plans. This isn't just looking at a part. And so the value of that is also separate from just sort of the fact of the part existence. So, but on the 3D, 2D part, Your Honors, you're absolutely correct. Our position is that you don't have to even look to the 3D as a separate trade secret because they're a combined package. And under this court's law... You mean the 2D? The 3D and 2D are combined. Drawings were both on the CAD files that were the basis of each of the counts of possession at issue here. And that the possession instruction here was absolutely accurate when it instructed the jury to look at really whether there was knowledge of the presence and then dominion and control. And here, the other point I want to make is that Kuczynski very specifically points out that access is one way to know that somebody has control or something is evidence of control. But it is not the only evidence of control. It says, where a defendant lacks access to and control over those files, it is not proper to charge him with possession and control of the child pornography images located in those files without some other indication of dominion and control over the images. So this court has very clearly noted that access is not the only way to show that someone has possession. There are other measures. But even if access were an important part of it, and it surely is, it's oftentimes the most obvious evidence, we have evidence here. The jury saw evidence that Mr. Olgato procured the NX software, and he was ready to use it. He was just waiting for the right time. Much of the evidence that goes, that we've sort of talked about already, goes also to the sufficiency on the element of intern intent to convert. Can I ask you a question? Are you conceding that Mr. Olgato would not be liable civilly for a trade secret? No. We actually think that he would be liable, but that's not a position we have to take here. In our argument and in our answering brief, we specifically talk about how we think that the evidence is sufficient to show that he acquired the trade secrets by improper means. He did it by violating these use and access restrictions that he was actually charged with enforcing that are set out in the Standards of Business Conduct. He did it through the improper means of circumventing. Right. Aren't you, in fact, arguing exactly the opposite of Judge Koh's question, which is that there is a higher standard? The government is required to show something more for the criminal prosecution of the theft of trade secrets than would otherwise be necessary for a civil liability under the statute for misappropriation. Isn't that how it ought to work? Yes, and the government has to show much more because it has to show the intent to convert. It has to show sort of the desire or the knowledge or the intent to injure the owner. That's not something that the civil is required for showing in the civil context. But with respect to the misappropriation part of it, the misappropriation is a higher standard. It's a more limited standard as opposed to appropriating without authorization. So there are more things that have to happen in order to convict somebody criminally, but the conduct is broader. The conduct in terms of whether it has to be a violation of if it has to meet 1839-5's definition of misappropriation, that's not sort of what sets it. But to the extent that this Court wants to use that as a guidepost, we think that we meet that in spades. So in this case, we would ask this Court to affirm. All right. Thank you. Thank you, Your Honor. I think the last 20 minutes actually is the best demonstrative I could have of why the rule of lenity requires this conviction to be reversed. We still do not have a standard from the government. And it's quite astounding, Judge Rupali, you're exactly right, that the government is here arguing that the standard for violating the criminal provision of the federal trade secret law is actually lower. It's a lower tripwire to commit an act of trade secret theft than it is in a civil case. In the briefs, the government strictly argued improper means are disclosure or use, which Judge Freeman turned to as the only reasonable place that one could go. So if that's what the statute means, it shouldn't be tested on Mr. Elgato for the first time. It certainly shouldn't be a criminal test case for determining that without authorization means something broader. Isn't one of your serious sort of obstacles on appeals the standard? So, you know, on an insufficiency of the evidence claim, we're supposed to view the evidence in a light most favorable to the government and ask whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. And that's a very tough standard for you to meet on appeal. Your Honor, we think that if you overlay what without authorization has to mean, that it either has to mean improper means or disclosure or use. It just didn't happen here. There was no breach of duty of secrecy. He never shared it with anyone else, and he didn't use it, and he didn't disclose it, and there was no actual breach of duty of something specific that the company required to do. Companies have hundreds of policies about use, confidentiality legends. If we don't anchor the government in a criminal case to point to a policy somebody actually took on and embraced, then we really are in pioneering land of the government just coming up with new theories. Let me just quickly turn to possession, Your Honor, before my time is up. If I could ask for 20 more seconds. 20 seconds. Go ahead, please. If you look at SER3331, I believe that the government misspoke on what the evidence was in the record concerning the NX software. The NX software, there was no reference in the invoice when Mr. Elgato purchased the Solid Edge software to any three-month trial. And the uncontradicted record shows that paperwork would have actually been required to provide the software and to secure a license from Siemens. So the record is undisputed. He did not have NX software. He had not gotten a license to NX software. He did not have any of the things that, just like Flyer says, would be required to access information. That's why there's insufficient evidence, and that's why the jury instruction was incorrect that access is required. All right. You're over time. 50 seconds. Thank you very much to both counsels. Very helpful arguments. Thank you. And we are adjourned. Thank you. All rise. Ms. Corker, Ms. Sessions, and the jury.
judges: GOULD, KOH, DESAI